Anthony Carl ("A.C.") Buchannon was convicted of first degree burglary and sentenced as a habitual offender to ninety-nine years' imprisonment. Three issues are raised in this appeal from that conviction.
Melanie McKee and her parents left the trailer in which they resided around 10:30 or 11:00 a.m. on October 14, 1987. They returned around noon to find that the trailer had been broken into and that several items of personal property, including a television, *Page 479 
camera, and 12-gauge shotgun, were missing. Melanie and her mother spotted a black male driving a gold colored automobile out of the woods near their trailer. Melanie followed the gold car in her mother's automobile, then signaled a police officer and informed him of the burglary. Several police officers took up the chase, which ended when the gold car crashed into a tree. The driver of the gold car exited the wrecked car and ran away. Police officers followed the driver on foot and apprehended him.
After being captured, the driver, identified as Buchannon, made a statement in which he admitted that he and an accomplice broke into the trailer and that he stole the television set. He also acknowledged that "he was the one that was being chased by the people that owned the house." The stolen items were later recovered from the trunk of the gold car, which was titled in the name of Buchannon's sister. Palm prints lifted from the television and shotgun were identified as Buchannon's. Buchannon did not present an affirmative defense.
 I
Buchannon argues that the trial court erred in admitting into evidence (1) finger and palm print records taken in connection with a criminal offense other than the burglary for which he was on trial and (2) the testimony of a fingerprint expert who identified prints lifted from the stolen goods. Buchannon was arrested for the instant offense on October 14, 1987. He was fingerprinted at that time by one Cooter Plant, who died prior to trial. The prints taken by Plant and the prints lifted from the stolen items were sent to the Alabama Bureau of Investigation ("ABI") for comparison. Two palm prints lifted from the stolen items were determined to be Buchannon's.
When preparing for trial, the assistant district attorney realized that he had no witness to testify concerning the prints taken by Plant. He requested the Opelika Police Department to send other fingerprints of Buchannon to the ABI for comparison. Another fingerprint card for Buchannon was located in the police department files and was sent to the ABI. These prints had been taken by Opelika Police Sergeant Thomas Paul Barnes on July 28, 1987 — approximately ten weeks before the present crime was committed. The ABI confirmed that these prints also matched prints lifted from the stolen goods. A photostatic copy of the July fingerprint card and expert testimony regarding the match between those prints and the prints lifted from the stolen goods were introduced at trial over Buchannon's objection.
 A
Buchannon first asserts that the July fingerprint record should not have been admitted because it indicated that he had a prior criminal record.
"Generally, evidence of other crimes which a defendant has committed is not admissible at his trial on a particular offense. McElroy's Alabama Evidence, § 69.01(1), Third Edition (1977)." Baldwin v. State, 456 So.2d 117, 121
(Ala.Cr.App. 1983), affirmed, 456 So.2d 129 (Ala. 1984), affirmed, 472 U.S. 372, 105 S.Ct. 2727, 86 L.Ed.2d 300 (1985). The effect of this rule on the admission of fingerprint cards was addressed by this court in Woodson v. State, 405 So.2d 967
(Ala.Cr.App.), cert. denied, 405 So.2d 969 (Ala. 1981), wherein we stated:
 "The general rule . . . is that the admission of a defendant's fingerprint identification card is not impermissibly prejudicial to the defendant where the card was altered prior to its introduction so that it did not disclose the defendant's criminal record. See Annot. 28 A.L.R.2d 1115 at Section 12 (1953). No prejudicial error has been found where the card does not indicate any prior criminal record or where such has been deleted or obliterated. United States v. Mancini, 396 F. Supp. 75 (E.D.Pa. 1975); State v. Ralls, 167 Conn. 408, 356 A.2d 147 (1974); Bradshaw v. State, 132 Ga. App. 363, 208 S.E.2d 173 (1974); Edmonds v. State, 5 Md. App. 132, 245 A.2d 618
(1968); State v. Jackson, 284 N.C. 321, *Page 480 200 S.E.2d 626 (1973); Lester v. State, 416 P.2d 52
(Okla.Cr. 1966); Burton v. State, 471 S.W.2d 817
(Tex.Cr.App. 1971).
". . . .
 "Each case of alleged error in the admission of a fingerprint record taken pursuant to another criminal offense and prior to the charge for which the accused is presently on trial must be judged upon its own merits." Woodson, 405 So.2d at 968-69 (emphasis added).
The fingerprint card in Woodson was found to be properly admitted because it did not indicate the defendant's connection with any other criminal offense. "The portions of the card that would indicate a prior arrest and disposition [had] been carefully covered with 'State's Exhibit' identification stickers in such a manner that it [was] not obvious that the stickers [were] concealing information." Woodson, 405 So.2d at 968.
In contrast, this court held in Brown v. State, 369 So.2d 881
(Ala.Cr.App. 1979), that a fingerprint card which contained the date of the prior arrest, a list of five aliases, and an FBI number should not have been admitted because "it subtly suggested guilt of other offenses." Brown, 369 So.2d at 884. InEx parte Johnson, 507 So.2d 1351 (Ala. 1986), our Supreme Court held that the trial court erred in admitting a fingerprint card which bore "the name of the appellant Johnson, a series of police numbers and an FBI number, the fingerprints themselves, and the signature of the taker of the impressions, and the date taken." 507 So.2d at 1352. The Supreme Court stated that this card contained "information which clearly revealed the defendant's past contacts with law enforcement agencies" from which "the jury could have readily inferred, at a minimum, that he had been arrested in the past." 507 So.2d at 1357.
In the present case, the State introduced a photostatic copy of the fingerprint card taken in July by Sergeant Barnes. Prior to the photocopying and introduction of this fingerprint card, the date of arrest and the information regarding the charge for which Buchannon was then under arrest were covered by small pieces of paper taped to the card. However, the word "Charge" remains visible, so that the piece of paper appears to (and obviously does) cover information related thereto. Additionally, the card reveals both an FBI and an SID number for Buchannon, the signature of the person who made the prints, and the date the prints were taken. We find no discernible difference between this card and the card condemned by the Supreme Court in Johnson and we conclude that the trial court erred in admitting this card.
However, improperly admitted evidence does not always require reversal. Our harmless error rule, Rule 45, A.R.A.P., provides:
 "No judgment may be reversed or set aside, nor new trial granted in any civil or criminal case on the ground of . . . the improper admission or rejection of evidence . . . unless in the opinion of the court to which the appeal is taken or application is made, after an examination of the entire cause, it should appear that the error complained of has probably injuriously affected substantial rights of the parties." (Emphasis added.)
In addressing an early federal harmless error statute, the United States Supreme Court noted that it is not the function of an appellate court to determine guilt or innocence or to speculate on the probable outcome of a retrial.
 "But this does not mean that the appellate court can escape altogether taking account of the outcome. To weigh the error's effect against the entire setting of the record without relation to the verdict or judgment would be almost to work in a vacuum. In criminal causes that outcome is conviction. This is different, or may be, from guilt in fact. It is guilt in law, established by the judgment of laymen. And the question is, not were they right in their judgment, regardless of the error or its effect upon the verdict. It is rather what effect the error had or reasonably may be taken to have had upon the jury's decision. The crucial thing is the impact of the thing *Page 481 done wrong on the minds of other men, not on one's own, in the total setting.
 "This must take account of what the error meant to them, not singled out and standing alone, but in relation to all else that happened. And one must judge others' reactions not by his own, but with allowance for how others might react and not be regarded generally as acting without reason. This is the important difference, but one easy to ignore when the sense of guilt comes strongly from the record.
 "If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand, except perhaps where the departure is from a constitutional norm or a specific command of Congress. But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand."
Kotteakos v. United States, 328 U.S. 750, 764-65,66 S.Ct. 1239, 1247-48, 90 L.Ed. 1557 (1946) (emphasis added) (citations and footnote omitted).
The Supreme Court later held, in Chapman v. California,386 U.S. 18, 22, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967), that even some constitutional errors could, "in the setting of a particular case [be] so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction."
 "In holding that the harmless-error rule governs even constitutional violations under some circumstances, the Court recognized that, given the myriad safeguards provided to assure a fair trial, and taking into account the reality of the human fallibility of the participants, there can be no such thing as an error-free, perfect trial, and that the Constitution does not guarantee such a trial. . . .
 "Since Chapman, the Court has consistently made clear that it is the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless, including most constitutional violations. . . . The goal . . . is 'to conserve judicial resources by enabling appellate courts to cleanse the judicial process of prejudicial error without becoming mired in harmless error.' "
United States v. Hasting, 461 U.S. 499, 508-09, 103 S.Ct. 1974,1980, 76 L.Ed.2d 96 (1983) (emphasis added) (citations and footnote omitted).
It is clear under Rule 45 and these United States Supreme Court cases that, in determining whether a particular error was harmless or prejudicial, this court is to review a defendant's trial as a whole, rather than to focus solely on the error involved. This review, of necessity, includes an evaluation of the evidence properly admitted against the defendant. "An error that might be prejudicial in a close case does not require reversal when evidence of the defendant's guilt is strong."United States v. Jackson, 588 F.2d 1046, 1056 (5th Cir.), cert. denied, 442 U.S. 941, 99 S.Ct. 2882, 61 L.Ed.2d 310 (1979) (quoting United States v. Roland, 449 F.2d 1281, 1282 (5th Cir. 1971); United States v. Lipscomb, 435 F.2d 795, 803 (5th Cir. 1970), cert. denied, 401 U.S. 980, 91 S.Ct. 1213,28 L.Ed.2d 331 (1971)); Boyd v. State, 50 Ala. App. 394, 397,279 So.2d 565, 568 (1973). See also Kotteakos, 328 U.S. at 763,66 S.Ct. at 1247 (in a criminal case an error "may be altogether harmless in the face of other clear evidence, although the same error might turn scales otherwise level"); Ex parte Harris,428 So.2d 124, 125 (Ala. 1983) ("When the evidence of the defendant's guilt is strong, the defendant must show that the trial court's error was prejudicial."). Cf. United States v.Lane, 474 U.S. 438, 450, 106 S.Ct. 725, 732, 88 L.Ed.2d 814
(1986) ("In the face of overwhelming evidence of guilt shown here, we are satisfied *Page 482 
that the claimed error [regarding misjoinder] was harmless").
As the Supreme Court has noted, "certain errors [such as those involving coerced confessions, the right to counsel, and an impartial judge] may involve 'rights so basic to a fair trial that their infraction can never be treated as harmless error.' " United States v. Hasting, 461 U.S. at 508, n. 6,103 S.Ct. at 1980, n. 6. Other errors may be prejudicial under the circumstances of a particular case. In either of these situations, of course, "[o]verwhelming evidence of guilt does not render [the] error harmless under Rule 45, Ala.R.App.P." Exparte Lowe, 514 So.2d 1049, 1050 (Ala. 1987).
In the present case, the admission of the fingerprint card amounted to the improper admission of collateral offenses. This was neither a constitutional violation, nor an inherently prejudicial error. It was, instead, a violation of a general exclusionary rule, to which there are a number of exceptions.[1] See generally C. Gamble, McElroy's AlabamaEvidence, § 69.01 (3d ed. 1977); Schroeder, Evidentiary Use InCriminal Cases of Collateral Crimes and Acts: A Comparison ofthe Federal Rules and Alabama Law, 35 Ala.L.Rev. 241 (1984). "Whether the improper admission of evidence [of collateral crimes] constitutes prejudicial error or harmless error must be decided on the facts of each case." United States v. Ismail,756 F.2d 1253, 1260 (6th Cir. 1985). "In considering the harmlessness of the error, it is proper to consider other evidence of the defendant's guilt." United States v. Davis,657 F.2d 637, 640 (4th Cir. 1981).
The evidence of Buchannon's guilt was virtually ironclad: Buchannon was chased from the scene of the burglary by one of the victims; the police took up this vehicular chase and continued the chase on foot after Buchannon crashed the car he was driving into a tree; Buchannon was apprehended and thereafter gave a statement in which he admitted committing the burglary; and fingerprints on the stolen goods were identified as Buchannon's. Furthermore, no undue emphasis was placed on the July fingerprint card in the presence of the jury. Sergeant Barnes testified before the jury only as to the actual taking of the prints and identified the prints as those he had taken. He did not testify as to the date they were taken or the reasons therefor.
In view of the overwhelming evidence of Buchannon's guilt, which included Buchannon's incriminating statement, and the unemphasized nature of the evidence of his prior arrest, our "conviction is sure that the error [in the admission of the latter] did not influence the jury." Kotteakos,328 U.S. at 764, 66 S.Ct. at 1248. Consequently, we hold that the admission of the fingerprint card containing information which indicated that Buchannon had had prior contact with law enforcement agencies was harmless error.
The Appellate Court of Illinois reached the same conclusion in People v. Zynda, 53 Ill. App.3d 794, 11 Ill.Dec. 471,368 N.E.2d 1079 (1977). The court stated that the "repeated, unnecessary reference by the State" to a fingerprint card containing a notation of a prior arrest constituted error. 11 Ill.Dec. at 478, 368 N.E.2d at 1086. However, the court concluded that this error did not deprive the defendant "of a fair trial in light of the overwhelming evidence against the defendant, which clearly established his guilt. . . ." Id. A large number of courts have reached this same conclusion with regard to other types of evidence indicating that the accused had a history of criminal activity of some sort. Government ofthe Virgin Islands v. Martinez, 847 F.2d 125, 131 (3d Cir. 1988) (where the evidence of defendant's guilt was overwhelming, "it is highly probable that the admission of [improper evidence of] prior illegal acts committed by [defendant] did not affect the judgment and thus was harmless error"); United States v.Velazquez, 847 F.2d 140, 143 (4th Cir. 1988) (in trial of several codefendants for instigating, aiding, and assisting escape, improperly *Page 483 
admitted evidence that Velazquez was armed with a hand grenade in an airport was harmless error, as "[t]his evidence alone could not have unduly prejudiced the jury, particularly in view of other overwhelming evidence of guilt"); United States v.Terry, 729 F.2d 1063, 1070-71 (6th Cir. 1984) (statements by police officer regarding defendant's parole status and former convictions were erroneously admitted but were not "prejudicial enough to warrant a new trial," where the evidence of defendant's guilt, which included incriminating statements by defendant, was overwhelming); Hobbs v. Lockhart, 791 F.2d 125,128 (8th Cir. 1986) (in federal habeas corpus proceeding by Arkansas inmate, "[t]he evidence of [defendant's] guilt [of capital murder] was so overwhelming that the error, if any, in admitting the challenged testimony [concerning other crimes and "bad acts" of defendant, including attempted escape from the county jail several months after the murder and the purchase of marijuana the day after the murder] must be characterized properly as harmless"); United States v. Clark, 732 F.2d 1536,1543 (11th Cir. 1984) ("although the disclosure on the witness stand by an FBI agent that Nichols [one of three codefendants on trial for drug-related offenses] had been previously arrested was error, it was harmless in light of the overwhelming evidence against Nichols"); People v. Williams,45 Cal.3d 1268, 248 Cal.Rptr. 834, 858, 756 P.2d 221, 245 (1988), cert. denied, ___ U.S. ___, 109 S.Ct. 883, 102 L.Ed.2d 1006
(1989) ("Whatever error may have occurred [during a robbery-murder trial by the improper admission of evidence regarding a subsequent burglary] was non-prejudicial. . . . [I]n light of [a codefendant's] testimony and the introduction of the murder weapon, an outcome more favorable to defendant would not have resulted in the absence of the claimed error");Craig v. State, 510 So.2d 857, 864 (Fla. 1987), cert. denied,484 U.S. 1020, 108 S.Ct. 732, 98 L.Ed.2d 680 (1988) (evidence of defendant's illegal use of drugs was improperly admitted in murder trial, but this error was harmless because "there was ample direct evidence of [defendant's] guilt on two counts of first-degree murder"); People v. Wadley, 169 Ill. App.3d 1036, 120 Ill.Dec. 338, 346, 523 N.E.2d 1249, 1257, appeal denied,122 Ill.2d 591, 125 Ill.Dec. 233, 530 N.E.2d 261 (1988) ("[w]here every element of the crime charged has been established by properly admitted evidence and that evidence is so overwhelming that there is no reasonable probability that defendant would have been acquitted if the inadmissible evidence [concerning the circumstances and details of defendant's prior arrests] had been excluded, the error is harmless"); People v. Pittman, 126 Ill. App.3d 586, 81 Ill.Dec. 796, 801, 467 N.E.2d 918, 923 (1984) ("the admission of a 'mug shot' [bearing the caption "Harvey Police Department" and certain of the defendant's vital statistics] is not reversible error where evidence of guilt is abundant, and it cannot be said that exclusion of the legends would have produced a different result"); Hodges v. State, 524 N.E.2d 774, 783
(Ind. 1988) (in a child molestation case, statements of defendant's wife concerning a prior rape by defendant was erroneously admitted; "[h]owever, in view of the unemphasized nature of the comment and the other evidence tending to show [defendant's] guilt, [which included a statement by defendant admitting to several instances of child molestation,] we find there is no substantial likelihood that the evidence contributed to the verdict, and we deem it to be [sic] have been harmless"); State v. Esparza, 39 Ohio St.3d 8,529 N.E.2d 192, 197 (1988), cert. denied, ___ U.S. ___, 109 S.Ct. 1657,104 L.Ed.2d 171 (1989) ("Any error [the testimony of defendant's cellmate, which revealed that defendant was being held for another crime when arrested on the instant charges,] may have caused was harmless, given the overwhelming evidence of [defendant's] guilt beyond a reasonable doubt"); Villalobosv. State, 756 S.W.2d 847, 850 (Tex.App. 1988) (evidence of extraneous offense of burglary was erroneously admitted in murder trial, but was harmless error due to the overwhelming evidence of defendant's guilt, which included the written confession of defendant); Miller v. State, 755 P.2d 855, 862-63
(Wyo. 1988) (any error in the admission of evidence *Page 484 
that defendant had improperly cashed checks owned by the murder victim was harmless "[b]ecause of the abundance of inculpatory evidence introduced against" defendant, which, "[i]n its totality, . . . was overwhelming" and the inconceivability "that a jury would be influenced to convict [defendant] of a crime of the magnitude charged here because they found out that he had improperly cashed" these checks). See also, UnitedStates v. Jackson; United States v. Roland; United States v.Lipscomb, supra. We note that in three of the above cases,United States v. Terry, Hodges v. State, and Villalobos v.State, as in the case at bar, the "overwhelming evidence" against the defendant included an incriminating statement by the defendant.
We are aware that there are cases wherein the admission of a fingerprint card containing information indicating past criminal activity on the part of a defendant was deemed to be prejudicial, requiring reversal. However, we find these cases distinguishable on the facts. In Brown v. State, supra, decided by this court, virtually the only evidence presented to the jury that connected the defendant with the burglary for which he was convicted was a set of fingerprints found at the scene. Consequently, the fingerprint card, with its extraneous data that "subtly suggested guilt of other offenses," played a crucial role in the defendant's conviction. Ex parte Johnson, supra, was a death case and the Alabama Supreme Court concluded that the inference of prior arrests arising from the information on the fingerprint card "had an almost irreversible impact upon the minds of the jurors." 507 So.2d at 1357. The Indiana Supreme Court held in Franklin v. State,533 N.E.2d 1195 (Ind. 1989), that a reversal was required by the jury's consideration of a fingerprint card which was not admitted into evidence, but was found by the jury in an admitted exhibit and which revealed that the defendant had been previously convicted. However, the trial court had granted the defendant's motion in limine prohibiting the prosecution from making any reference to the defendant's criminal history; the evidence against the defendant was entirely circumstantial; and the prosecution's case was partially based upon the testimony of defendant's fellow prisoners concerning statements made by defendant while in jail. None of the circumstances found in these cases is present in the case at bar.
 B
In connection with the admission of the July fingerprint records, Buchannon also avers that the trial court erred in admitting a copy of these records because the "rules of evidence call for the original to be introduced when it is available." Appellant's brief, at 5. Buchannon has not, however, identified what specific rule or rules of evidence he refers to, nor has he provided us with any authority to support this contention.
In any event, "fingerprint records may properly be admitted as business records." Bighames v. State, 440 So.2d 1231, 1235
(Ala.Cr.App. 1983) (quoted in Gurganus v. State, 520 So.2d 170,176 (Ala.Cr.App. 1987). Photocopies of business records "shall be deemed to be an original record and shall be admissible in evidence . . . in all instances that the original record might have been admissible. . . ." Ala. Code 1975, § 12-21-44(a).
The officer who took the July prints, Sergeant Barnes, described the general procedure for taking fingerprints and the filing and maintenance of fingerprint cards in the Opelika Police Department. He also testified as to the taking of Buchannon's prints, identified the July prints as those he had taken, and identified the photostatic copy as a correct copy of the original. There was no error in the admission of the fingerprint records on the basis that such records were copies.Cf. McClain v. State, 473 So.2d 612, 615-16 (Ala.Cr.App. 1985) (admission of a photostatic copy of a bank deposit slip was proper under § 12-21-44); Neal v. State, 372 So.2d 1331, 1343
(Ala.Cr.App.), cert. denied, 372 So.2d 1348 (Ala. 1979) (holding that a photocopy of a registration of a television was admissible under § 12-21-44 "which deals with photocopies of business records"). *Page 485 
 C
Buchannon contends that the trial court erred in admitting evidence regarding the identification of the prints lifted from the stolen goods because the state did not disclose this evidence to him prior to trial as required by Rule 18.1, A.R.Crim.P. (Temp.).
On January 13, 1988, the trial judge issued a "Discovery Order," which provided in pertinent part:
 "The State and Defense are hereby Ordered to comply with the Discovery provisions as set forth in Rule 18, Alabama Rules of Criminal Procedure without necessity for the filing of specific discovery motions as follows:
 "1. Upon written request of either the State or Defense, directed to the other, the parties shall make available to each other all Discovery as provided in Rule 18." (Emphasis in original.)
The results of fingerprint comparisons clearly fall within Rule 18.1(d), A.R.Crim.P. (Temp.), which provides:
 "Upon motion of the defendant the court shall order the district attorney to permit the defendant to inspect and copy any results or reports of physical or mental examinations or scientific tests or experiments, if the examinations, tests, or experiments were made in connection with the particular case and the results or reports are within the possession, custody, or control of the state, and their existence is known to the district attorney."
On January 27, 1988, Buchannon filed a "Motion to Produce" which, in essence, was a written request that the district attorney produce, among other items, "all results or reports or physical examinations or scientific tests or experiments." This motion certified that a copy had been served upon the district attorney.
At trial, defense counsel strenuously objected to the introduction of any evidence regarding a match between the prints lifted from the stolen goods and Buchannon's prints, maintaining that he had not been furnished with this information prior to trial as required by the discovery order. During a discussion held outside the presence of the jury, defense counsel stated that he had inquired as to information regarding fingerprints and, although he was told that fingerprints were lifted from the crime scene and that "we'll let you know when we get [the lab report] in," he was never informed that the crime scene prints had been identified as Buchannon's.
The state did not seek to refute defense counsel's statements. Compare Poe v. State, 510 So.2d 852
(Ala.Cr.App. 1987). Instead, the assistant district attorney claimed that he was not aware of a match until the day of the trial. However, he also stated:
 "As we indicated to the Court earlier, we had a copy [of Buchannon's prints] that Cooter Plant had taken and, of course, we sent those . . . [t]o the ABI and they came back and matched the defendant.
Well, of course, as the Court, I believe, is aware Cooter is now dead and we can't use something that he did so that's why we had to go back and find other prints." (Emphasis added.)
Later in the discussion, the assistant district attorney said:
 "Judge, if I may, I was looking at the file in preparation for trial and I noticed the problem we were going to have with Cooter Plant's fingerprints — the ones he had taken, and I telephoned [Opelika Police Detective Ronnie Robinson] and they had to do something about that, and that's when we sent these particular [the July] prints over there [to the ABI]."
Also during this discussion, the trial judge asked, "Well, when was it that it turned out that they matched? How long have ya'll [sic] been knowing that?" Opelika Police Detective Ronnie Robinson stated: "I think it was the first, or about the middle of January or the first of February. It was January 20th of 1988." Robinson was obviously referring to the match between the prints taken by Plant and the prints lifted from the stolen goods, for shortly after making this statement he indicated that he received the confirmation of the match between the July prints and the prints lifted from the stolen goods on the *Page 486 
Friday prior to Buchannon's trial (which began on Monday, February 29, 1988). At the end of this discussion, the trial court overruled defense counsel's objection, stating, "that particular information apparently didn't become available until last Friday." However, this court is unable to distinguish between the assistant district attorney's knowledge, sometime after January 20,[2] of the match between the crime prints and the prints taken by Plant and his knowledge, on February 29, of the match between the crime prints and the July prints. While the assistant district attorney may not have been informed of the match between Buchannon's July prints and the prints lifted from the stolen goods until the day of trial, it is clear from the above comments that he was aware of a match between Buchannon's prints and the prints lifted from the stolen goods well in advance of the day of trial. In fact, he knew of a
match far enough in advance of trial to have the July prints, for which he had the officer taking the prints available to testify, sent to the ABI for comparison. It is clear that the assistant district attorney knew at the time the July printswere sent to the ABI that the prints lifted from the stolen goods had been identified as Buchannon's. The July prints were sent to the ABI only to enable the state to introduce Buchannon's known prints as the basis for introducing evidence of the matching prints.
In the final analysis, the assistant district attorney knew before trial that Buchannon's prints matched the prints lifted from the stolen goods. Consequently, this information should have been provided to Buchannon within a reasonable time prior to trial, in view of the discovery order of the trial judge and the subsequent motion to produce filed by Buchannon. Under the facts of this particular case and in view of the virtually unchanging nature of fingerprint evidence, the question of the admissibility of the prints taken by Plant (a question which we specifically do not address in this opinion) does not affect either the assistant district attorney's knowledge of the match or his duty to disclose this information to appellant.
This court views the failure to comply with Rule 18 with particular disfavor and condemnation. However, we also recognize that a failure to comply with this rule does not always mandate reversal. Rule 18.5(a), A.R.Crim.P. (Temp.), provides:
 "If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule, or with an order issued pursuant to this rule, the court may order such party to permit the discovery or inspection; grant a continuance if requested by the aggrieved party; prohibit the party from introducing evidence not disclosed; or enter such other order as the court deems just under the circumstances."
This rule is virtually identical to Rule 16(d)(2), Fed.R.Crim.P., which clearly places the remedy for violations of discovery rules within the sound discretion of the trial court. United States v. Kubiak, 704 F.2d 1545 (11th Cir.), cert. denied, 464 U.S. 852, 104 S.Ct. 163, 78 L.Ed.2d 149
(1983). See also McCrory v. State, 505 So.2d 1272
(Ala.Cr.App. 1986). "To support a claim for reversal of the exercise of that discretion, the accused must show prejudice to substantial rights." United States v. Kidding, 560 F.2d 1303,1313 (7th Cir.), cert. denied, 434 U.S. 872, 98 S.Ct. 217,54 L.Ed.2d 151 (1977) (quoted in United States v. Kubiak, supra, at 1552).
Our Rule 18.5(a), like Federal Rule 16(d)(2), "does notrequire . . . courts to exclude evidence not turned over to the discovering party in violation of a discovery order." UnitedStates v. Bartle, 835 F.2d 646, 649 (6th Cir. 1987), cert. denied, 485 U.S. 969, 108 S.Ct. 1245, 99 L.Ed.2d 443 (1988). Instead, these rules provide "for a variety of remedies that optimally allow the admission of the probative evidence while insuring that the opposing party has *Page 487 
adequate time to prepare for it. Among these remedies are the recess and the continuance." Id., at 650. Where either a recess or continuance would have served to protect the defendant's interest, but neither was requested at trial, a defendant "is not in a position to fault the court for denying his motion to exclude." Id.; accord, United States v. Kubiak, supra.
Buchannon requested only the most severe remedy — total exclusion of the evidence. It appears to this court that either a recess or continuance would have been sufficient to protect his interests and permit him to review and evaluate this particular evidence in the same manner as had he received this information prior to trial. Having failed to make any showing to the contrary and having failed to request either a continuance or recess, Buchannon cannot claim error on the part of the trial court in denying his request to exclude the evidence. United States v. Bartle; United States v. Kubiak, supra. Moreover, as set forth at the beginning of this opinion, there was abundant evidence aside from the fingerprint evidence to establish guilt. Accordingly, we find that there was no prejudice to Buchannon's substantial rights in the trial court's refusal to exclude the fingerprint evidence. Cf. UnitedStates v. Glaze, 643 F.2d 549 (8th Cir. 1981) (in conviction for unlawful distribution of controlled substance, laboratory test alone firmly identified substance as cocaine so as to support verdict and there was no prejudice to defendant's substantial rights in the admission of a field test which had not been provided to defendant prior to trial); Hamilton v. State,496 So.2d 100, 107 (Ala.Cr.App. 1986) ("The appellant's guilt was established beyond a reasonable doubt, and access to the taped recording [which was not furnished to him prior to trial] would have been inconsequential to his defense . . .").
 II
There was no error in the trial court's admission of a television, camera, and shotgun found in the trunk of the automobile Buchannon was driving at the time of the burglary. Prior to the search of this vehicle, a 1977 Ford Thunderbird, the police obtained the written consent of Buchannon's sister, Maebell Buchannon.
 "It is well recognized that some third parties may validly consent to a search of premises or the effects of an absent defendant, if such third party shares with the defendant 'common authority over or other sufficient relationship to the premises or effect sought to be inspected.' United States v. Matlock, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); Myers v. State, 55 Ala. App. 404, 316 So.2d 235 (1975); Scott [v. State], 337 So.2d 1342 (Ala.Cr.App. 1976)."
Ballard v. State, 461 So.2d 899, 903 (Ala.Cr.App. 1984). The voluntariness of Ms. Buchannon's consent is not challenged on appeal. Buchannon asserts only that she lacked the requisite authority to consent to the search of the car because he was its actual owner.
The only evidence regarding the ownership of the car was the testimony of Ms. Buchannon. She stated that she bought the car and that the title to the car was in her name, "but it's not my car." Ms. Buchannon maintained that the car was Buchannon's because "[h]e paid for it." However, she also testified that she had given the purchase money to the seller and still had the receipt; that she drove the car on occasion and had possession of the keys from time to time; that she permitted other members of her family besides Buchannon to drive the car; and that she had intended to "put it in insurance and do all of what needed to be done." Insurance was never obtained for the car, and Ms. Buchannon acknowledged that she was aware that she could be financially responsible in the event the car was involved in an accident. New license tags were not procured for the car during the four years between the purchase of the car and the trial.
"While a certificate of title is prima facie evidence of ownership [of an automobile], § 32-8-39(d), Ala. Code (1975), this can be contradicted by other evidence." Murray v. Dempsey,521 So.2d 1345 (Ala.Civ.App. 1988). Accord, Mobile Dodge, Inc.v. Alford, 487 So.2d 866 (Ala. 1986), appeal dismissed, *Page 488 
___ U.S. ___, 108 S.Ct. 2008, 100 L.Ed.2d 596 (1988);Felder v. State, 515 So.2d 17 (Ala.Civ.App. 1987). We do not find anything in the evidence presented sufficient to overcome the presumption of Ms. Buchannon's ownership of the vehicle created by the certificate of title in her name. Cf. CongressFinance Corp. v. Funderburk, 416 So.2d 1059 (Ala.Civ.App. 1982) (holding that possession of bill of sale by debtor's brother-in-law and his assertion that he used the vehicle in question in his business was not sufficient to overcome the presumption of ownership by the debtor who was named on the certificate of title, who had personally made payments on the bank loan for the vehicle, and who was listed as the registered owner on the tag application and insurance); GovernmentEmployees Ins. Co. v. Fulmer, 376 So.2d 748 (Ala.Civ.App. 1979) (holding that a bill of sale was not sufficient to overcome the presumption of ownership by the entity named on the certificate of title). Ms. Buchannon's testimony does not support Buchannon's contention that "the possession, custody and control of the automobile was at all times with [him]." Appellant's brief at 10.[3]
Although we find that Ms. Buchannon was the owner of the vehicle, her authority to consent to the search does not turn solely on such ownership:
 "Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justified the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, see Chapman v. United States, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961) (landlord could not validly consent to the search of a house he had rented to another), Stoner v. California, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964) (night hotel clerk could not validly consent to search of customer's room) but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the coinhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." United States v. Matlock, 415 U.S. at 171, n. 7, 94 S.Ct. at 993, n. 7.
Ms. Buchannon's ownership of the car, coupled with her testimony regarding her use of and intentions toward the car, lead us to conclude that she exercised sufficient control over the car to validly consent to its search. Even if Buchannon did in fact furnish the purchase money for the car, Ms. Buchannon's testimony establishes that he thereafter subjected the car to her joint control. "If one subjects his property to the exclusive or joint control of another, he assumes the risk that consent will be granted by the other to a search of the property." Ex parte Hilley, 484 So.2d 485, 490 (Ala. 1985).
 III
Buchannon contends that he was improperly convicted of first degree burglary because he was not "armed" as that word is contemplated by Ala. Code 1975, *Page 489 
§ 13A-7-5.[4] He relies on this court's opinion in Caine v. State,453 So.2d 1081 (Ala.Cr.App. 1984), as authority for this position. This issue provides this court with the opportunity to examine our past decisions in this area.
Our research leads us to conclude that the dispositive question in this case is whether the definition of "armed" should recognize a distinction between the perpetrator who equips himself with a weapon prior to the crime and the perpetrator who acquires a weapon during the crime. Few courts have troubled to define "armed" when construing statutes similar to § 13A-7-5. In the majority of cases, courts simply hold that certain conduct during a burglary constitutes being "armed" without any discussion of the meaning of that term.See, e.g., State v. Belton, 190 Conn. 496, 461 A.2d 973 (1983);Mills v. State, 400 So.2d 516 (Fla.Dist.Ct.App. 1981), review denied, 408 So.2d 1094 (Fla. 1981); State v. Singleton,602 S.W.2d 3 (Mo.App. 1980).
In one of the few cases where "armed" is defined, People v.Tracey A., 97 Misc.2d 1053, 413 N.Y.S.2d 92, 95 (1979)[5], it was stated;
 "A person 'arms' himself when he is furnished or equipped with weapons of offense or defense. The word 'armed' applies to any situation where a gun or deadly weapon is within the immediate control of a person and is available for use."
However, in view of the prior decision of a higher New York court in People v. Williams, 63 A.D.2d 1035, 406 N.Y.S.2d 341
(1978), this definition is overbroad, at least insofar as its applicability to "any situation." In Williams, the defendant managed to obtain possession of a police officer's gun during a scuffle with the officer, then ran away. The New York Supreme Court, Appellate Division, held that this did not constitute first degree (armed) robbery[6]:
 "Under the peculiar circumstances of this case, we conclude that a robbery which consists of the taking of a weapon, and the immediate flight from the location with that weapon, without more, does not constitute robbery in the first *Page 490 
degree within the meaning of section 160.15 of the Penal Law. The fact that the stolen property is a deadly weapon does not in and of itself convert the robbery into a robbery in the first degree, i.e., robbery while armed with a deadly weapon . . ." 406 N.Y.S.2d 342-43 (emphasis added).
The Arizona Court of Appeals has defined "armed" in language closely akin to the Tracey A. definition, but without TraceyA.'s overbroad application to "any situation." In State v.Romero, 135 Ariz. 102, 105, 659 P.2d 655, 658 (Ariz.App. 1982), that court stated: "A person is 'armed' with a deadly weapon when such weapon is within his immediate control and available for use in the crime." Accord, State v. Hall, 46 Wn. App. 689,732 P.2d 524, 528, review denied, 108 Wn.2d 1004 (1987) ("For purposes of first degree burglary [under a statute similar to §13A-7-5(a)[7]], the defendant is armed with a deadly weapon if a firearm is 'easily accessible and readily available for use by the defendant for either offensive or defensive purposes."). This definition of "armed" works very well when applied to the perpetrator who equips himself with a weapon prior to the crime. In that situation, the mere fact that the perpetrator is in possession of the weapon raises the inferences that the weapon is available for use in the crime and that the perpetrator intended to use it. See People v. Garcia,228 Cal.Rptr. 87, 183 Cal.App.3d 335 (1986). However, such inferences should not automatically arise when an originally unarmed defendant steals a weapon, thereby "possessing" it, during the course of a burglary. In the latter instance, mere possession does not equate with "armed."
We are aware that a contrary view has been taken in some jurisdictions. State v. Dopson, 323 So.2d 644, 645
(Fla.Dist.Ct.App. 1975) (where defendant broke into residence while owners were on vacation and stole items including a loaded .38 caliber pistol, the appellate court did not "find any support for the alleged requirement that the state must show the person charged intended or was willing to use such weapon in the furtherance of the crime being committed"; "[a] loaded pistol is a dangerous weapon and to take possession thereof is to arm oneself."); Meadows v. Commonwealth,551 S.W.2d 253, 255 (Ky.Ct.App. 1977) (where defendant broke into a temporarily unoccupied dwelling and stole a gun, "[i]t is the opinion of this Court that under the applicable law of this Commonwealth and under the circumstances where it is used statutorily, there is virtually no difference between being in possession of a deadly weapon and being armed with a deadly weapon"); Britt v. State, 734 P.2d 980, 982 (Wyo. 1987) (defendant who broke into gun shop and stole 10 weapons, including a Baretta .22 automatic with silencer (which the court noted is an assassin's gun rather than a sporting gun), "suggest[ed] that there is a meaningful distinction between possession of a deadly weapon and 'armed with a deadly weapon" '; court held, "[u]nder the circumstances of this case, however, there is no significant difference between being in possession and being armed"). See State v. Luna, 99 N.M. 76,653 P.2d 1222 (N.M.App.), cert. quashed, 99 N.M. 148,655 P.2d 160 (1982) (applying Meadows v. Commonwealth, supra). However, in at least two of these jurisdictions, this view is not etched in stone. In Florida, a different district court of appeals has held that the "mere showing of a theft of a gun after entering a structure, standing alone, is insufficient to establish burglary armed with a dangerous weapon." Sanders v. State,352 So.2d 1187, 1188 (Fla.Dist.Ct.App. 1977). See also Wilson v.State, 378 So.2d 1258 (Fla.Dist.Ct.App. 1979), cert. quashed,395 So.2d 520 (Fla. 1981). Also, in Britt v. State, supra, the Wyoming Supreme Court inserted the following *Page 491 
footnote at the end of the sentence quoted above: "Arguably, under some circumstances (not present here), it might be appropriate to make a distinction between being in possession and being armed with a deadly weapon."
The Arizona Supreme Court recognized the difference between mere possession and being "armed" in State v. Befford,148 Ariz. 508, 715 P.2d 761 (1986). In Befford, the defendant and an accomplice were seen climbing out the window of a residence. When the police entered the residence, they found several items, including an unloaded 12-gauge shotgun, beside the front door. In reducing Befford's conviction of first degree burglary[8]
to second degree burglary, the court said that these facts stretched the definition of "armed" found in Romero, supra, beyond what was contemplated by the Arizona legislature or courts.
 "[W]e see no evidence that defendant possessed the gun as a 'weapon'; rather, he possessed it in the same status he possessed the television sets, jewelry and various other items of value stacked near the door. He possessed them as stolen goods or loot.
 "Were we to hold otherwise and find that under these facts an armed burglary had occurred, the result would be to classify most every burglary as first degree. For example, A.R.S. § 13-105(7) defines dangerous instrument as 'anything that under the circumstances in which it is used, . . . is readily capable of causing death or serious physical injury.' Therefore, were a perpetrator to steal, as loot, anything such as a valuable hunting knife, a set of tools, a baseball bat, or even a lamp, he could be charged with armed burglary. In fact, most household items, 'under the circumstances,' could conceivably be used as a deadly weapon.
 "We do not believe the legislature intended such a result; neither do we believe it to be warranted under current Arizona case law nor a commonsense interpretation of the statutory language. In order to be 'armed' within our burglary statute, a defendant must possess the item considered a deadly weapon or dangerous instrument in such a manner as to indicate his willingness or present ability to use it as a 'weapon.'" 148 Ariz. at 510, 715 P.2d at 763 (emphasis added).
It is clear from the first and second quoted paragraphs that the Arizona Supreme Court intended the italicized portion of the third paragraph to apply only in cases where the perpetrator steals a weapon on during the burglary. The perpetrator who equips himself with a weapon prior to a burglary unquestionably falls within the definition of "armed" set forth above and no further analysis is required.
In State v. Williams, 154 Ariz. 366, 742 P.2d 1352 (1987), the Arizona Supreme Court again addressed this issue and indicated that, where a perpetrator acquires a weapon during a crime, the use to which he puts the weapon is crucial in determining whether the perpetrator was "armed." The court examined the Romero and Befford cases, stating:
 "In [Romero], the court of appeals stated: 'A person is "armed" with a deadly weapon when such weapon is within his immediate control and available for use in the crime.' The defendant in Romero stole a pistol and holster during the burglary of a residence and apparently stuck it inside his belt. When police arrived on the scene, Romero pulled the gun, still in its holster, and pointed it at an officer. The court held that 'a person can become armed with a deadly weapon even if the weapon is one taken during the course of a burglary.' It would appear that the court considered the use to which the gun was put after its theft and properly held that the defendant was armed during the burglary.
 "We examined what constitutes being 'armed' with a weapon stolen during a *Page 492 
burglary in [Befford] . . . In Befford, the defendant burgled a residence and was observed by the police leaving through a window. When the police entered the residence, they found several items of value placed near the front door, including the victim's unloaded 12-gauge shotgun in a zippered case. We found that under these facts, the defendant was not 'armed' with a deadly weapon, stating: 'In order to be "armed" within our burglary statute, a defendant must possess the item considered a deadly weapon or dangerous instrument in such a manner as to indicate his willingness or present ability to use it as a "weapon".' Again, the use to which the burglar put the stolen gun was critical." (Emphasis added.) (Citations omitted.)
This court applied the same reasoning, although not expressly so stating, in Caine v. State, 453 So.2d 1081
(Ala.Cr.App. 1984), the case upon which appellant relies. Although Caine involved a conviction for first degree robbery under § 13A-8-41, Ala. Code (1975), that section is sufficiently similar to § 13A-7-5 for Caine to be analogous.[9] Caine and an accomplice robbed their victim of $350 and a .32 caliber pistol, then ran away. We reversed Caine's conviction, holding that such conduct did not constitute robbery in the first degree.
In Caine, we reviewed several cases from other jurisdictions, and based the reversal of the conviction on the New York case of People v. Williams, supra. However, we did not specifically discuss the term "armed," nor did we explicitly recognize a distinction, with regard to that term, between perpetrators who equip themselves with a weapon prior to committing an offense and perpetrators who steal a weapon during the offense. We simply held that there was "no showing that either of the robbers was armed with a deadly weapon or dangerous instrument." 453 So.2d at 1082 (emphasis added).
Once Caine and his accomplice took the pistol from the victim, one of the two had the gun "within [his] immediate control" and "available for his use," which clearly fits within the definition of "armed" set forth in Romero, supra. Nevertheless, a majority of this court concluded that there was no evidence that the robbers were "armed." Implicit in this conclusion is the recognition that, in determining what constitutes "armed," there is a distinction between those perpetrators who equip themselves with a weapon prior to a crime and those who acquire a weapon during a crime.
The words "armed with a deadly weapon" appear in at least three sections of our criminal code, §§ 13A-7-5(a), 13A-7-6(a)[10], and 13A-8-41(a), but the term "armed" is not statutorily defined therein. We have not found any commentary relating to what constitutes "armed." The term, however, must, of necessity, be accorded some consistency of meaning in §§13A-7-5(a), 13A-7-6(a), and 13A-8-41(a) due to the similarity of the language of those sections. See footnotes 4, 9, and 10 herein. Each of these sections lists certain specific aggravating factors which increase the degree of the offense and consequently the severity of the punishment. An aggravating factor in each section is the fact that the perpetrator *Page 493 
is armed with a deadly weapon. That the perpetrator engages in the theft of a deadly weapon is not an aggravating factor in any of these sections. Compare § 13A-8-4(d), Ala. Code (1975) (providing that "[t]he theft of a firearm, rifle or shotgun, regardless of its value, constitutes theft of property in the second degree"). Therefore, by the use of the term "armed," it appears that the legislature intended something other than the mere theft of a weapon.
Our opinion in Caine and the Arizona Supreme Court's opinions in State v. Befford and State v. Williams, supra, all support the proposition that, where a perpetrator acquires a weaponduring a crime, he is "armed" with that weapon only if there is a showing that the weapon was "possessed" or "used" in some manner other than mere loot from the crime. Cf. Sanders v.State, 352 So.2d 1187, 1188 (Fla.Dist.Ct.App. 1977), cert. denied, 362 So.2d 1056 (Fla. 1978) ("[M]ere showing of theft of a gun after entering a structure, standing alone, is insufficient to establish burglary armed with a dangerous weapon."); Wilson v. State, 378 So.2d 1258
(Fla.Dist.Ct.App. 1979), cert. quashed, 395 So.2d 520 (Fla. 1981) (same); People v. Williams, 63 A.D.2d 1035, 406 N.Y.S.2d 341
(1978). This court has adopted a similar approach, i.e., focusing on use, in determining whether a particular item is a "deadly weapon" under § 13A-1-2(11), Ala. Code (1975).[11] See Hillv. State, 516 So.2d 876 (Ala.Cr.App. 1987); Stewart v. State,405 So.2d 402 (Ala.Cr.App. 1981); Helton v. State, 372 So.2d 390
(Ala.Cr.App. 1979). We are convinced that this is also the correct approach in determining whether an accused is "armed" when he steals a weapon during a burglary.
We are aware that this court has reached a contrary result inHenry v. State, 448 So.2d 432 (Ala.Cr.App. 1983); Bates v.State, 468 So.2d 207 (Ala.Cr.App. 1985); and Lovell v. State,477 So.2d 485 (Ala.Cr.App. 1985). Reducing these three cases to the simplest of terms, Henry stands for the proposition that the mere taking of a gun renders a burglar "armed" under §13A-7-5, and Bates and Lovell appear to hold that simply taking a loaded[12] gun during a burglary will "arm" the burglar so as to come within § 13A-7-5 or § 13A-7-6(a).
The term "armed" was discussed only in Bates. There we quoted the overbroad definition found in People v. Tracey A., supra, and specifically held "that in order to commit the crime of burglary in the second degree when the accused is 'armed with . . . a deadly weapon,' the deadly weapon need not be used, threatened, or displayed." 468 So.2d at 207. Our re-examination of this issue leads us to conclude that this statement is correct when the perpetrator equips himself with a weapon prior
to the burglary, but it is not the proper approach when the perpetrator steals a weapon during the burglary. We note that there was evidence in Bates that the defendant pointed the gun that he stole during the burglary at a police officer while effecting his escape.
After careful consideration of the matter, we are convinced that the position taken by the Arizona Supreme Court and by this court in Caine is correct in terms of both legislative intent and fairness in the law. We now hold that in determining whether a defendant is "armed," a distinction must be made between the perpetrator *Page 494 
who equips himself with a weapon prior to the crime and the perpetrator who steals a weapon during a crime. In order for the latter to be "armed," there must be a showing that the stolen weapon was possessed in "such a manner as to indicate his willingness or present ability to use it as a 'weapon' " and not merely as loot from the crime. State v. Befford, supra. The mere showing that the defendant stole a weapon during the course of a burglary or robbery, without more, does not constitute being "armed." To the extent that our opinions inHenry, Bates, and Lovell conflict with this holding, those cases are expressly overruled.
In the present case, the state's evidence tended to prove that Buchannon broke into a trailer while its occupants were away and stole several items, including a 12-gauge shotgun. Buchannon was chased from the scene by one of the victims and then by police officers, who eventually apprehended him. The stolen items, including the shotgun, were later recovered from the trunk of the automobile driven by Buchannon. There was no evidence that the shotgun was ever possessed by him as anything other than loot from the burglary. Under these facts, we find that Buchannon was not "armed" within the meaning of §13A-7-5(a)(1).
Having found that Buchannon was not "armed," we must conclude that the evidence was insufficient to support his conviction of first degree burglary. When the evidence is insufficient to support a conviction, the double jeopardy clause of the Fifth Amendment prohibits this court from remanding the cause for a new trial. However, we may remand for proper sentencing if the evidence is sufficient to convict the accused of a lesser included offense. See Ex parte Edwards, 452 So.2d 508
(Ala. 1984); Pack v. State, 461 So.2d 910 (Ala.Cr.App. 1984).
In the instant case, the trial judge instructed the jury on second degree burglary as defined by § 13A-7-6(a)(1), which is the unlawful entry of or remaining in a building with the intent to commit a crime therein while "armed with a deadly weapon." We have already determined that Buchannon was not "armed"; therefore, the evidence would also be insufficient to support his conviction for this form of second degree burglary.
The trial judge also charged the jury on third degree burglary which is defined in Ala. Code 1975, § 13A-7-7, as knowingly and unlawfully entering or remaining in a building with intent to commit a crime therein. Burglary in the third degree is a lesser included offense of burglary in the first degree, as the former may be established by proof of fewer than all the facts required to prove the latter. See Ala. Code 1975, § 13A-1-9(a)(1). "[S]ince the jury returned a verdict on the higher degree, it found the existence of every element of the lesser included offense." Utley v. State, 508 So.2d 287, 288
(Ala.Cr.App. 1986). We find that the state's evidence in this case clearly supports a conviction of third degree burglary.
We remand this cause to the Lee County Circuit Court with instructions to the trial judge to conduct a new sentencing hearing, at which Buchannon shall be present and represented by counsel. The trial court shall set aside Buchannon's conviction of burglary in the first degree, adjudge him guilty of burglary in the third degree, and sentence him accordingly. A return reflecting these actions shall be filed with this court.
REVERSED IN PART; REMANDED WITH DIRECTIONS.
All Judges concur.
[1] It is obvious that the information contained on the fingerprint card does not fit within any of the exceptions to this rule. No contention to the contrary has been made by the State.
[2] The record does not indicate the precise date on which the assistant district attorney obtained this information.
[3] Buchannon relies on the case of Dalton v. State, 230 Ind. 626,105 N.E.2d 509 (1952), to support his position that Ms. Buchannon had no authority to consent to the search of the car. In Dalton, the Indiana Supreme Court held that a wife who held title to an automobile, but who had never driven an automobile in her life, could not consent to the search of an automobile used exclusively by her husband because, absent express authorization by her husband, she could not "waive" his right to be secure from unreasonable searches and seizures. As noted above, Ms. Buchannon's testimony fails to show that Buchannon had exclusive use of the Thunderbird. Moreover, the reasoning of Dalton was effectively overruled by the Indiana Supreme Court in Bruce v. State, 268 Ind. 180, 375 N.E.2d 1042 (1978), cert. denied, 439 U.S. 988, 99 S.Ct. 586, 58 L.Ed.2d 662
(1978):
 "Dalton probably reached the proper result but its analysis is no longer employed by the courts in determining the authority of third persons to consent to searches. The present view is that 'the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared.' " 375 N.E.2d at 1072 (citations omitted).
[4] Section 13A-7-5(a), Ala. Code (1975), provides:
 "(a) A person commits the crime of burglary in the first degree if he knowingly and unlawfully enters or remains unlawfully in a dwelling with intent to commit a crime therein, and, if, in effecting entry or while in dwelling or in immediate flight therefrom, he or another participant in the crime:
"(1) Is armed with . . . a deadly weapon; or
 "(2) Causes physical injury to any person who is not a participant in the crime; or
 "(3) Uses or threatens the immediate use of a dangerous instrument." (Emphasis added.)
[5] Interestingly enough, Tracey A. did not turn on whether the defendant was "armed," but whether the gun stolen by the defendant was a "deadly weapon." The defendant admitted taking a gun and bullets during a burglary, but there was no competent evidence that the gun was loaded at the time of the theft. The court cited several California cases which indicated that theft of a loaded gun would constitute "arming" oneself, but the theft of an unloaded gun as part of the loot would not. Moreover, the New York Penal Code defines deadly weapon as aloaded gun. The court concluded that the defendant was improperly convicted of first degree burglary under Section 140.30 of the New York Penal Code, which provides in pertinent part:
 "A person is guilty of burglary in the first degree when he knowingly enters or remains unlawfully in a dwelling at night with intent to commit a crime therein, and when, in effecting entry or while in the dwelling or in immediate flight therefrom, he or another participant in the crime:
"1. Is armed with . . . a deadly weapon; or
 "2. Causes physical injury to any person who is not a participant in the crime; or
 "3. Uses or threatens the immediate use of a dangerous instrument; or
 "4. Displays what appears to be a pistol, revolver, rifle, shotgun, machine gun or other firearm."
(Emphasis added.)
[6] The New York first degree robbery statute is similar enough to both the New York burglary statute and our own § 13A-7-5(a) to permit analogy in determining the meaning of "armed." New York Penal Law, Section 160.15, provides, in pertinent part:
 "A person is guilty of robbery in the first degree when he forcibly steals property and when, in the course of the commission of the crime or of immediate flight therefrom, he or another participant of the crime:
". . . .
2. Is armed with a deadly weapon." (Emphasis added.)
[7] Section 9A.52.-020(1)(a), R.C.W., provides in pertinent part:
 "A person is guilty of burglary in the first degree if, with intent to commit a crime against a person or property therein, he enters or remains unlawfully in a dwelling and if, in entering or while in the dwelling or in immediate flight therefrom, the actor or another participant in the crime (a) is armed with a deadly weapon, or (b) assaults any person therein." (Emphasis added.)
[8] Under A.R.S. § 13-1508(A), "a person commits burglary in the first degree if such person or an accomplice [enters or remains unlawfully within a structure with the intent to commit any theft or felony therein] and is armed with . . . a deadlyweapon or a dangerous instrument in the course of committing any theft or felony." (Emphasis added.)
[9] Section 13A-8-41, Ala. Code (1975), provides in pertinent part:
 "(a) A person commits the crime of robbery in the first degree if he violates section 13A-8-43 and he:
 "(1) Is armed with a deadly weapon or dangerous instrument;
or
"(2) Causes serious physical injury to another."
(Emphasis added.)
Section 13A-8-43, Ala. Code (1975), provides in pertinent part:
 "(a) A person commits the crime of robbery in the third degree if in the course of committing a theft he:
 "(1) Uses force against the person of the owner or any person present with intent to overcome his physical resistance or physical power of resistance; or
 "(2) Threatens the imminent use of force against the person of the owner or any person present with intent to compel acquiescence to the taking of or escaping with the property."
[10] Section 13A-7-6(a), Ala. Code (1975), which defines one form of burglary in the second degree, is identical to § 13A-7-5(a), with the exception that § 13A-7-6(a) applies to the entry of, or remaining unlawfully in, a building rather than a dwelling.
[11] Section 13A-1-2(11), Ala. Code (1975), defines "deadly weapon" as
 "A firearm or anything manifestly designed, made or adapted for the purposes of inflicting death or serious physical injury, and such term includes, but is not limited to, a pistol, rifle or shotgun; or a switchblade knife, gravity knife, stiletto, sword or dagger; or any billy, black-jack, bludgeon or metal knuckles." (Emphasis added.)
Under this section, we have determined that baseball bats, fists, and feet and shoes can be deadly weapons by virtue of the use to which they are put. Hill v. State; Stewart v. State;Helton v. State, supra.
[12] We have held, however, that "[t]he definition of a deadly weapon [in § 13A-1-2(11)] does not require that a firearm be loaded at the time of the offense." Sumpter v. State,480 So.2d 608, 614 (Ala.Cr.App. 1985). See also Lidge v. State,419 So.2d 610 (Ala.Cr.App.), cert. denied, 419 So.2d 616 (Ala. 1982).