UNITED STATES of America,
Plaintiff-Appellee,

v.

Terrence A. KUBIAK, David Parks,
Theodore Burton, IV,
Defendants-Appellants.

No. 81–6007.

United States Court of Appeals,
Eleventh Circuit.

May 20, 1983.

Rehearing and Rehearing En Banc
Denied Aug. 3, 1983.

Gregory M. Wagner, Daytona Beach, Fla., Richard D. Bertone, Holly Hill, Fla., for Kubiak.

Joseph T. Garlovsky, Daytona Beach, Fla., for Parks.

Dan Warren, Daytona Beach, Fla., for Burton.

Joseph T. Urbaniak, Jr., Asst. U.S. Atty., Orlando, Fla., for plaintiff-appellee.

Before FAY and VANCE, Circuit Judges, and ALLGOOD *, District Judge.

PER CURIAM:

Appellants Terrence Kubiak, Theodore Burton, and David Parks were found guilty of conspiracy to possess with the intent to distribute marijuana and possession with the intent to distribute marijuana, in violation of 21 U.S.C. Sections 841(a)(1) and 955c.[1] The three men were tried together in the district court, and each has appealed. Upon review, we affirm each conviction.

## BACKGROUND

At approximately 3:00 p.m. on February 5, 1981, a communications employee of the United States Coast Guard received an anonymous phone call from a man who stated that a large transfer of marijuana was to take place off the Ponce de Leon Inlet in the Atlantic Ocean. No other information was given. The information was relayed immediately to Chief Boatswain Mate David Creed of the Coast Guard. Chief Creed promptly ordered a boat crew to check the area in the Atlantic Ocean east of the Inlet and to remain in radio contact with the Coast Guard station.

The crew left the station in a 40-foot Coast Guard vessel under the command of Randy Miller, Boatswain Mate Second Class. The Coast Guard vessel encountered a 31-foot Chris Craft Sport Fisherman named the Shannon Brown II about five to six miles east of the shoreline of New Smyrna Beach. When first sighted by the Coast Guard, the Shannon Brown was lying dead in the water, and no other boats were in the immediate vicinity. As the Coast Guard vessel came within one-half mile of the Shannon Brown, her engines started and she moved at a high rate of speed on a northeasterly course away from the approaching Coast Guard vessel. The Shannon Brown continued on this course for a minute or two and then turned toward the Coast Guard vessel and proceeded at a slow rate of speed. At this point Randy Miller radioed the Shannon Brown and stated his intention to board the boat and conduct a documents and safety inspection.

As the two vessels neared, Randy Miller noticed that the bow of the Shannon Brown was riding low in the water and that the registration numbers displayed on her bow indicated that the boat was registered in Delaware whereas the port of call painted on the transom was New Smyrna Beach.

Randy Miller sent a two-man boarding party to the Shannon Brown. The boarding party found two people on board the vessel—appellants Burton and Kubiak. The boarding party was advised that the cabin was locked and neither occupant had a key. No registration papers were produced and the boarding party noticed that there were no floatation devices visible above decks. They also noticed that the doors to the cabin of the boat were locked, all port holes were covered with a tinting material and

---

* Honorable Clarence W. Allgood, U.S. District Judge for the Northern District of Alabama, sitting by designation.

1. Appellant Parks was found guilty only of conspiracy to possess with the intent to distribute marijuana. A motion for a directed verdict of acquittal on behalf of appellant Parks was granted as to the substantive possession charge.

draped, and the window in the door of the cabin was tinted but not draped.

The Shannon Brown was escorted back to the Coast Guard station at Ponce Inlet for the purpose of finishing the safety and document search that was commenced on the high seas, but frustrated by the boarding party's inability to enter the cabin.

When the Shannon Brown approached the dock at the Coast Guard station, the Coast Guard's dock crew noticed that the boat was riding low in the water. After the Shannon Brown docked, appellant Burton was asked if the boat was taking on water. He responded that she was taking on a lot of water. The dock crew was concerned that the Shannon Brown might sink at dockside.

Several members of the dock crew looked through the tinted window of the vessel's cabin door and saw what appeared to be bales of marijuana. They also smelled marijuana. The Coast Guard broke the cabin door open and discovered square packages wrapped in burlap and plastic, containing marijuana.

The Coast Guard placed appellants Burton and Kubiak under arrest and then contacted numerous federal, state, and local law enforcement agencies; thereafter, law enforcement officers arrived from the New Smyrna Beach Police Department, the U.S. Customs Service, the Volusia County Narcotics Task force, and the federal Drug Enforcement Administration.

Federal authorities declined federal prosecution in favor of state prosecution, even though the initial arrest was made by the U.S. Coast Guard. Consequently, after appellants Burton and Kubiak were arrested by the Coast Guard, they were rearrested on February 5, 1981, by Florida state and local law enforcement officers. The appellants were charged by an information filed in the Florida Circuit Court for the Seventh Judicial Circuit.

The state prosecuting authorities became concerned that the state court might lack jurisdiction over the appellants because the Shannon Brown was apprehended beyond the three-mile limit. Federal prosecuting authorities were encouraged to take over the prosecution of the offense. On April 9, 1981, a federal grand jury investigation was commenced, and on June 10, 1981, an indictment was returned against appellants Burton, Kubiak, and several other persons for violation of the federal laws relating to controlled substances. Appellants Burton and Kubiak voluntarily surrendered themselves to the United States Attorney for the Middle District of Florida. No federal complaint was ever filed, nor was any federal arrest warrant obtained for the arrest of Burton or Kubiak.

*Appellants Burton and Kubiak*

On appeal appellants Burton and Kubiak argue that the district court committed reversible error in denying their motions to suppress the physical evidence seized from the Shannon Brown, since the initial stop and boarding of the vessel was unconstitutional. We find this argument unavailing. The Shannon Brown was stopped five or six miles from the Florida coastline. She was therefore in customs waters and subject to the operation of federal law. Where a vessel is subject to the operation of federal law, Section 89(a), 14 U.S.C. Section 89(a) (1976), "gives the Coast Guard plenary power to stop and board [the vessel or] any American Flag vessel anywhere on the high seas in the complete absence of suspicion of criminal activity."[2]

---

2. Section 89(a) provides the following:
   The Coast Guard may make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection and suppression of violations of laws of the United States.
   For such purposes, commissioned, warrant and petty officers may at any time go on board of any vessel subject to the jurisdiction, or to the operation of any law, of the United States, address inquiries to those on board, examine the ship's documents and papers, and examine, inspect and search the vessel and use all necessary force to compel compliance. When from such inquiries, examination, inspection or search it appears that a breach of the laws of the United States rendering a person liable to arrest is being, or has been committed, by any person, such

*United States v. Williams,* 617 F.2d 1063, 1075 (5th Cir.1980) (en banc); *United States v. Warren,* 578 F.2d 1058, 1064 (5th Cir. 1979) (en banc). Once boarded it was readily apparent that the vessel was in noncompliance as to the proper documents and safety equipment. The observations made thereafter provided an ample basis for the action taken by the Coast Guard.

■ Appellants Burton and Kubiak also contend that the trial court committed reversible error in denying their motions to dismiss the indictment for an alleged violation of the Speedy Trial Act of 1974, 18 U.S.C. Sections 3161, *et seq.* (1976) (the "Act"). The appellants sought a dismissal of the indictment with prejudice pursuant to Section 3162(a)(1), which reads as follows:

> (a)(1) If, in the case of any individual against whom a complaint is filed charging such individual with an offense, no indictment or information is filed within the time limit required by section 3161(b) ... such charge against that individual contained in such complaint shall be dismissed or otherwise dropped...

In *United States v. Sayers,* 698 F.2d 1128 (11th Cir.1983), a panel of this court recently observed that "[t]his provision establishes that Congress intended the provisions of the Act to apply only if an individual was formally charged with an offense." At 1131.

The record in this case reveals that although the appellants were initially arrested by federal authorities, they were never taken before a federal magistrate; nor were federal charges ever lodged against the appellants in a complaint.[3] For this reason, the motions of appellants to dismiss the indictment for Speedy Trial Act violations were properly denied by the trial court.[4]

We affirm the convictions of appellants Burton and Kubiak.

*Appellant Parks*

■ Appellant Parks initially contends that the evidence was insufficient to support his conviction on the conspiracy count. The applicable standard of review for a sufficiency challenge recently was enunciated in *United States v. Bell,* 678 F.2d 547 (5th Cir. Unit B) (en banc), *cert. granted,* —— U.S. ——, 103 S.Ct. 444, 74 L.Ed.2d 600 (1982):

> It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt. A jury is free to choose among reasonable constructions of the evidence.

678 F.2d at 549 (footnote omitted). Viewing the evidence presented in this case and

---

person shall be arrested .... or other lawful and appropriate action shall be taken; or if it shall appear that a breach of the laws of the United States has been committed so as to render such vessel, or the merchandise, or any part thereof, on board, ... such vessel, liable to forfeiture, or so as to render such vessel liable to a fine or penalty, such vessel or such merchandise, or both shall be seized. This statute has been held constitutional. *Williams,* at 1075.

3. In fact, the federal law enforcement authorities declined prosecution in favor of the state law enforcement agency. Only after jurisdictional problems arose in the state prosecution did the federal authorities become involved in the investigation. Federal involvement culminated in the return of a federal indictment. Consequently, appellants Burton and Kubiak were not held to answer in federal court until they were indicted.

We briefly note that in *Sayers* the government admitted that the defendant was seized, temporarily taken into custody, photographed and fingerprinted before being released. And, the defendant in that case believed himself to be under arrest at that time. Nevertheless, the court agreed with the government's contention that " 'arrest' in the Speedy Trial Act refers to that point at which a defendant is first charged with a crime. Since no complaint or formal charge was issued against [the defendant on the date of his original arrest] ... he was not 'arrested' within the meaning of that Act." At 1130.

4. Applying the test set forth in *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), we hold that the delay between the appellants' arrest and their indictment also does not violate their constitutional right to a speedy trial.

the inferences that may be drawn from it in the light most favorable to the government, see, e.g., *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), we conclude that a reasonable jury could find appellant Parks guilty of the conspiracy count.

On February 5 in the early morning hours, Parks was observed at the Riverside Marina with Burton, Brown, Walker, Kubiak and a number of other people. He left the marina in a 262 Chris Craft. At least two other boats left at the same time. Several hours later Parks returned to the marina in the same boat, refueled and left. As he was departing, Parks told several marina employees that Burton was having trouble out in the ocean and he was returning to assist him. Parks was observed returning again to the marina in the late afternoon in the same 262 Chris Craft. Observers described the boat as then riding "bow heavy." The next morning employees of the marina noticed the 262 Chris Craft was missing. A day or so later Parks ordered two employees to where it was located. These men found the boat sitting on the bottom in 3 or 4 feet of water with marijuana residue floating in it. They pumped it out and returned it to Riverside Marina. One of these men, Stires, gathered up some marijuana residue from the boat and took it home. Stires testified that he later gave the same marijuana to a DEA agent. Stires also testified that Parks had told him that he (Parks) was to receive $25,000 for his part in the deal. Such evidence is sufficient to sustain Parks' conviction.

■ Appellant Parks also contends that his conviction should be reversed because certain exculpatory evidence was withheld from him by the prosecution. Relying on *Brady v. Maryland,*[5] 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the appellant maintains that due process was violated by the prosecution's failure to provide him, in a timely manner, an exculpatory statement made by a jointly-indicted co-conspirator.

Although we find the untimely disclosure troubling, we have concluded that the rule of *Brady v. Maryland* was not violated by the prosecution's failure to provide the defense with the co-conspirator's statement in a timely manner. We first note that "the circumstances at the trial below did not resemble the typical situation giving rise to a *Brady* claim. As the Supreme Court observed in *United States v. Agurs,* the context in which *Brady* claims are generally raised 'involves the discovery, *after* trial, of information which had been known to the prosecution but unknown to the defense.' 427 U.S. at 103, 96 S.Ct. at 2397." *United States v. Kopituk,* 690 F.2d 1289, 1339 (11th Cir.1982). In this case, the record reveals that the statement of the appellant's co-conspirator was discovered and presented at trial. Consequently, appellant Parks' *Brady* claim involves mere delay in the transmittal of information or materials to the defense and not outright omission that remained·undiscovered until after trial.

"In considering whether the government's nondisclosure of exculpatory information operated to deny a federal defendant his right to due process of law guaran-

---

5. The *Brady* doctrine holds that "suppression ... of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or the bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1196. In *United States v. Agurs,* 427 U.S. 97, 108, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the Supreme Court discussed three situations in which *Brady* violations may occur in a given case. In the first, the prosecution knows or should know that the undisclosed information indicates that the prosecution's case will include perjured testimony. In the second, the defense specifically requests the disclosure of evidence that was withheld. In the third, no request or only a general request for all exculpatory material is made, and certain exculpatory material is not tendered. 96 S.Ct. at 2397–99. In *Garrison v. Maggio,* 540 F.2d 1271 (5th Cir.1976), *cert. denied,* 431 U.S. 940, 97 S.Ct. 2655, 53 L.Ed.2d 258 (1977), as we stated in *United States v. Anderson,* 574 F.2d 1347, 1353 (5th Cir.1978), this court "defined a fourth type of situation in which the *Brady* doctrine applies: the prosecutor fails to disclose purely impeaching evidence not concerning a substantive issue, in the absence of a specific defense request." Varying degrees of materiality are assigned depending upon the context of the alleged violation.

teed by the [f]ifth [a]mendment, the focus is not upon the fact of nondisclosure, but upon the impact of the nondisclosure on the jury's verdict." *Kopituk,* at 1339. "As was stated in *United States v. Agurs, supra,* no denial of due process occurs 'unless the omission deprived the defendant of a fair trial....'" *Id.,* at 1340, *citing,* 427 U.S. at 108, 96 S.Ct. at 2399. In the instant case, any possible prejudice resulting from the untimely disclosure could have been easily cured during trial.

Prior to trial, the prosecution properly informed the defense that it had taken the statement of co-conspirator Steve Brown and that the statement contained evidence favorable to the defense. The defense took no action to obtain the evidence. Although during trial the defense expressed a general concern over the government's failure to supply *Brady* materials, it never moved the trial court to compel the government to turn over the co-conspirator's statement. Indeed, the defense took no affirmative steps to secure the information, even though co-conspirator Brown was present in the courtroom on the first day of trial. On the third day of trial, in an effort to insure that appellant Parks had the benefit of any materials which could conceivably aid him in his defense, the trial court, *sua sponte,* ordered the government to turn over the co-conspirator's statement. After receiving the information, the defense simply renewed its request for a mistrial. This request was denied.

Claiming that the trial court erred in denying its motion for a mistrial, the appellant now argues that the belated discovery prejudiced the preparation of his case; the appellant maintains that had he known of Steve Brown's statement he could have fully exploited its exculpatory possibilities. The evidence of record refutes this contention. The record clearly indicates that the defense knew before trial and was reminded during trial that the government had in its possession evidence favorable to the defense. Not once did the defense make a meaningful attempt to obtain this information. Even after receiving the co-conspirator's statement on the third day of trial the defense did not move for a continuance or request a recess. Further, the defense never introduced co-conspirator's Brown's statement into evidence, nor did it attempt to call Steve Brown as a witness. These failures undercut any arguments of prejudice the appellant attempts to make at this time. *Gorham v. Wainwright,* 588 F.2d 178, 180 (5th Cir.1979).

The difficulty with appellant Parks' *Brady* claim can be seen from another perspective. *Brady* is implicated only when the evidence withheld is "material."[6] It is noteworthy in this connection that the appellant's basic argument is that the belated discovery hampered his trial preparation and affected his trial strategy. But the Supreme Court has specifically rejected the proposition that the applicable standard of materiality should focus on the defendant's ability to prepare for trial. *United States*

---

**6.** The trial transcript provides in relevant part:

MR. GARLOVSKY [defense counsel]: Well, I feel we're entitled—this is again my problem on the discovery. I feel Mr. Brown's statement, which looked like it was about a hundred or 200 pages, may contain Brady material.

MR. URBANIAK [government's counsel]: It *does contain some Brady material* in small respects that I have informed Mr. Garlovsky of, that I'll pick out the pieces. I told him what is Brady in that, just as I told him about Mr. Stiers' statement. Mr. Stiers may or may not have an explanation for not telling the Grand Jury.

I sent a letter out where I said you might want to look at this. This witness a couple times appeared before the Grand Jury and

didn't tell everything he knew the first time and later turned the evidence in. So, be aware of it. There is some Brady material in Mr. Brown's statements.

MR. URBANIAK: Yes, sir. He has previously been informed, Judge, for the record, and he can disagree with it, that there was certain Brady material. And, I have informed what it was, as to whether—at whose instance the boats were taken from the marina. Now, I have told him that.

MR. GARLOVSKY: I don't think he told me, your Honor, that this was Steve Brown's Brady material. He has never sent me a letter to that effect or gave me any specific statements that Brown gave a two-hundred-page statement.

(R.Vol. 15 of 16, pp. 567–569).

*v. Agurs,* 427 U.S. at 112 n. 20, 96 S.Ct. 2392, 2402, 49 L.Ed.2d 342. Rather, the inquiry is whether presentation of the evidence would create a "reasonable doubt of guilt that would not otherwise exist."[7] *Id.* at 112, 96 S.Ct. at 2402.

The government offered as circumstantial evidence against the accused his statement to a government witness that the witness may find himself shot if he talked. In its closing argument, the prosecution argued that the appellant's threatening of a government witness indicated a consciousness of guilt. On appeal, the appellant maintains that Steve Brown's statement would have refuted the government's assertion that he was attempting to protect himself by making threatening statements to a government witness; the appellant further argues that the statement would have shown that he was merely expressing his own fears to the witness when he uttered the threatening-like statement.[8] Viewing the record as a whole, we are unconvinced that co-conspirator Brown's statement, if timely disclosed and admitted into evidence, would have altered the jury's verdict.[9]

On cross-examination, a government witness testified that he had overheard the appellant talking to Steve Brown, that the appellant told Brown that he should be careful of what he says or else he could end up shot. The witness specifically testified that he believed the appellant to be expressing his own fears and not making a threat. *Brief of Appellant Parks,* at 35. This evidence did exactly what the appellant claims the statement of co-conspirator Brown would have done: it rebutted the government's argument that the appellant was attempting to protect himself by threatening a government witness, and tended to show that the appellant was merely expressing a well-founded fear on his part to the witness. Consequently, *Brady* provides no relief for the appellant since the introduction of co-conspirator Brown's statement would have been cumulative at best. The overwhelming evidence of guilt in this case belies any notion that the discovery material might have created a reasonable doubt. *See Agurs.* We conclude that appellant Parks suffered no deprivation of his right to a fair trial because of the belated discovery of his co-conspirator's statement.

■ Appellant Parks also contends that the district court erred when it failed to strike the testimony of a government chemist; he argues that the testimony should have been stricken as a discovery sanction against the government for its failure to provide the defense with a copy of a relevant lab report prior to trial. Fed.R.

7. The *Brady* mandate "commands the disclosure of *exculpatory* evidence, a requirement that invites review of the record for materiality." *United States v. Beasley,* 576 F.2d 626, 630 (5th Cir.1978). Indeed, "[t]he judicial emphasis consistently has been placed on the determination of materiality." *United States v. Anderson,* 574 F.2d 1347, 1353 (5th Cir.1978); *United States v. Mesa,* 660 F.2d 1070, 1076 (5th Cir. Unit B 1981).

8. This is the standard of materiality that applies when the defense has made, as in this case, a general request for *Brady* material. *See Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

9. The relevant part of co-conspirator Brown's statement reads as follows:

Q. Okay. You said, Dave, that boat's got to be on the trailer?
A. Yes, sir.
Q. And what did he say?
A. He didn't want to do it. He didn't want to, but I told him that I didn't have any choice and that they'd threatened my family and threatened me, and they knew who I was.
And I—I guess I kind of begged him.
Q. Okay.
A. And I—at the time, I guess, truthfully, our biggest concern was trying to preserve the marina because he, you know, he was really concerned about that.
Q. Dave was?
A. Yes, sir.
Q. Did he say anything—what else did he say, now?
A. These people wanted their stuff, you know. And he said he didn't want to be involved.
And I said, you know, that I didn't have any choice and that's really all we discussed.
Q. What else did he say?
A. He just said that I could use that truck, and he said not to get caught with it.

Crim.P. 16(d)(2) makes it clear that the choice of remedy for a violation of discovery requirements is committed to the sound discretion of the trial court:

> If ... it is brought to the attention of the court that a party has failed to comply with this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances.

"To support a claim for reversal of the exercise of that discretion, the accused must show prejudice to substantial rights." *United States v. Kidding,* 560 F.2d 1303, 1313 (5th Cir.1977). The appellant has made no such showing here. The appellant simply asserts that the government's untimely disclosure of the lab report denied him his right to effectively challenge the report or pursue further discovery concerning the evidence or the government witness. *Brief of Appellant Parks,* at 24. We note, however, that the only step taken by the defense to relieve itself from the predicament it now complains of, was its request that the chemist's testimony be stricken from the record. The defense never asked for a recess, let alone a continuance, to give it an opportunity to review the report. No request had been made for inspection or testing of the seized contraband. There had been no issue concerning identity of the substance. The defense simply acquiesced in the continuation of the trial. *See United States v. James,* 495 F.2d 434, 436–37 (5th Cir.1974); *see also United States v. Avila,* 443 F.2d 792, 795 (5th Cir.1971). To put it simply, the prejudice now complained of by the appellant "could perfectly well have been ratified by a recess. Absent such a request the court cannot be faulted for having denied the request to preclude the [g]overnment from alluding to the [report] in question." *United States v. Pineros,* 532 F.2d 868, 872 (2nd Cir.1976). Although we don't condone the government's actions, we hold that in the particular circumstances of this case, the government's failure to comply with the discovery rules until the time of trial does not amount to reversible error.

Appellant Parks' remaining claims have less merit. The appellant contends that the sample of marijuana taken by a government witness from one of the boats used in the criminal activity was improperly admitted into evidence over objection. He claims the government failed to introduce evidence connecting the marijuana to him. "It is clear that connection of physical evidence with a defendant may be shown by circumstantial evidence." *United States v. Soto,* 591 F.2d 1091, 1099 (5th Cir.1979); *United States v. White,* 569 F.2d 263, 266 (5th Cir.1978). Further, we have consistently held that "proof of the connection goes to the weight of the physical evidence rather than its admissibility." *Soto,* at 1091–92; *United States v. Stewart,* 579 F.2d 356, 359 (5th Cir.1978); *United States v. Hughes,* 658 F.2d 317, 320 (5th Cir., Unit B 1981); *United States v. Poe,* 462 F.2d 195 (5th Cir.1972). Stires testified the marijuana he gave to the government came from the 262 Chris Craft. Other witnesses testified as to the chain of custody from that point forward. The questions concerning how and where the substance was kept by Stires were proper for the jury as was the credibility of all the witnesses. Appellant Parks' insistence that the government's failure to establish a chain of custody of the marijuana sample prevents the admission of such evidence is equally meritless, "as evidence regarding a chain of custody does not affect admissibility, only the weight of the evidence." *United States v. Morgan,* 559 F.2d 397, 399 (5th Cir.1977); *United States v. Hughes,* at 320; *United States v. Colatriano,* 624 F.2d 686 (5th Cir.1980); *United States v. Henderson,* 588 F.2d 157 (5th Cir.), *cert. denied,* 440 U.S. 975, 99 S.Ct. 1544, 59 L.Ed.2d 794 (1979).

We affirm the conviction of appellant Parks.

## CONCLUSION

We have examined thoroughly all of the appellants' contentions raised on appeal, including those not worthy of discussion, and

find them to be without merit. The appellants' convictions are AFFIRMED.