KATHLEEN CARDONE, UNITED STATES DISTRICT JUDGE
On this day, the Court considered Defendant's Motion for Discovery Sanctions, ECF No. 51. For the reasons set forth below, the Motion is GRANTED in part and DENIED in part.
I. BACKGROUND
On March 3, 2018, Defendant entered the United States from the Republic of Mexico at the Bridge of the Americas Port of Entry in a gray 1983 Ford F-150 truck. Compl 2, ECF No. 1.[1] Defendant was found to be pushing the vehicle through the vehicle lane to the border checkpoint. Id. At secondary inspection, a canine alerted to the gas tank area of the vehicle. Id. Upon testing, the solution in the gas tank tested positive for methamphetamine. Id. Further inspection revealed 3.33 kilograms of liquid methamphetamine solution in the tank. Id.
On March 28, 2018, Defendant was charged in a four-count Indictment with *937 Conspiracy to Import, Importation, Conspiracy to Possess with Intent to Distribute, and Possession with Intent to Distribute 500 grams or more of Methamphetamine. Indictment ECF No. 11. In spite of the fact that there was a significant amount of methamphetamine found in the vehicle and this is an offense that carries a significant penalty, by the government's own admission, on March 23, 2018, it destroyed the vehicle. This was five days prior to Indictment, and after, in the government's own words, a highly contentious detention hearing on March 8, 2018. Gov't Resp. 3, Ex. B, ECF No. 78; Jul. 30, 2018, Hr'g.
On May 31, 2018, the government disclosed to Defendant a DHS "Person Subject Record" that contains an undated remark that Defendant "has multiple crossings occupying a vehicle that was discovered to have a hidden compartment in the backseat." Mot. 3; Jul. 30 Hr'g. Then, on June 8, 2018, the government disclosed to Defendant an undated memo from CBP Officer Eric Gonzalez stating that he had inspected Defendant's vehicle on February 24, 2018, days before the Defendant's subsequent crossing and arrest, as he entered the United States at the Paso del Norte Port of Entry in the same vehicle. Mot. 3; Jul. 30 Hr'g. Officer Gonzalez stated that he noticed the truck had dual gas tanks and had "visible tampering" on bolts on both tanks. Mot. 3; Jul. 30 Hr'g.
II. DISCUSSION
In the Motion, Defendant seeks to:
exclude all photographs any photographs depicting the appearance of the vehicle and the gas tank; exclude any evidence of and inferences drawn from the bolts to the gas tank allegedly having visible tampering; exclude any evidence of and inferences drawn from the vehicle allegedly having dual gas tanks; exclude any evidence of and inferences drawn from the vehicle allegedly having a hidden compartment behind the back seat; admit evidence of spoliation; and include a jury instruction directing an inference that all evidence destroyed or mishandled in the case would produce evidence favorable to Mr. Nunez.
Mot. 3.
The United States Supreme Court has held that the government violates a defendant's right to due process when: (1) it destroys evidence whose exculpatory significance is "apparent before" destruction; and (2) the defendant remains unable to "obtain comparable evidence by other reasonably available means." California v. Trombetta , 467 U.S. 479, 489, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984). Further, if the exculpatory value of the evidence is undetermined, but may be "potentially useful" to the defense, then a defendant must show that the government acted with bad faith in destroying the evidence. Arizona v. Youngblood , 488 U.S. 51, 58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). The destruction of potentially useful evidence does not violate due process "unless a criminal defendant can show bad faith on the part of the police." Illinois v. Fisher , 540 U.S. 544, 547-48, 124 S.Ct. 1200, 157 L.Ed.2d 1060 (2004) (per curiam). Moreover, the government commits bad faith in this context when it intentionally impedes the defense. United States v. McNealy , 625 F.3d 858, 870 (5th Cir. 2010). And, in the specific context of the destruction of Jencks material prior to indictment, the Fifth Circuit has found "a high likelihood of prejudice" to a defendant because the defendant could have used the evidence to impeach the government's most important witnesses. United States v. Ramirez , 174 F.3d 584, 589 (5th Cir. 1999).
*938 A. Destruction of Evidence in Bad Faith
In the instant case, the government has flirted extremely close, indeed perhaps too close, with the line into bad faith such that Youngblood would mandate suppression of the destroyed evidence. As explained in more detail below, there are myriad ways that an inspection of the destroyed vehicle could have yielded evidence: evidence useful to showing Defendant's lack of knowledge of the presence of the drugs, and evidence useful to impeaching Defendant's important law enforcement witnesses. See Youngblood , 488 U.S. at 58, 109 S.Ct. 333 ; Ramirez , 174 F.3d at 589. With regard to bad faith, the government argued at the July 30 Hearing that it could not have acted in bad faith because it destroyed the vehicle pursuant to statutory and regulatory legal authority. The government argued that 19 U.S.C. § 1612 and 19 C.F.R. 162.48 provide it with the discretion to destroy the vehicle upon a determination that the cost of keeping the vehicle "is disproportionate to the value" of the vehicle. Jul. 30 Hr'g at 10:06 a.m.; 19 U.S.C. § 1612. Thus the government contends that its election to destroy the vehicle cannot be made in bad faith.
In light of Fifth Circuit case law, this Court is not so convinced as the government that the government can hide behind a discretionary statute and regulation in an attempt to impede the defense in its case in chief or even in impeachment and cross-examination of important witnesses. See McNealy , 625 F.3d at 870 ; Ramirez , 174 F.3d at 589. At the hearing, the government was unable to even demonstrate that the destruction of the vehicle was carried out pursuant to this law that it so feels so comfortable in relying upon. When asked by the Court about the cost to store the vehicle and the value of the vehicle, the factors to be weighed according to the statute relied upon by the government, the government was entirely unprepared to justify its determination that the cost of storage of the vehicle was disproportionate to the vehicle's value such that destruction was warranted. The government's reliance on statutory and regulatory law to head off a finding of bad faith is questionable, perhaps reckless, given the facts of this case adduced at the hearing.
Viewing the government's explanation for its destroying the vehicle in the light of the timeline of the case, the government's motivations are all the more suspect. Defendant was arrested on March 3, 2018. Then, only ten days after his arrest, and fifteen days prior to Indictment, the government had already initiated the process to destroy the vehicle by sending a Notice of Seizure letter about the seizure to the purported owner of the vehicle on March 13, 2018. Resp. Ex. B. Moreover, in the intervening period of time between arrest and the Notice of Seizure letter being sent to the vehicle's purported owner, the Magistrate Judge held the preliminary detention hearing on March 8, 2018, which in the government's own words, was "highly contentious." Jul. 30 Hr'g; Detention Hr'g Minute Entry, ECF No. 9. Thus, the defense put the government on notice very early in the case that it would seek to actively litigate it.
Calling the government's motivations here further into doubt, the vehicle was destroyed on March 23, 2018, only ten days after the letter was purportedly mailed to the vehicle owner in Mexico. However, waiting only ten days for a response after mailing a letter to a foreign country, here Mexico, strikes the Court as a very short period of time. More significantly, the Court has reason to doubt the veracity of the government's statement that it provided notice the vehicle's owner prior to the vehicle's destruction. The DHS
*939 Order to Destroy the Vehicle and the Disposition Order were both dated March 13, 2018, the very same day that notice was purportedly mailed to the vehicle's owner. Mot. Ex. A, ECF No. 51-1. Therefore, the evidence shows that the government did not even wait the meager ten days for a response from the Mexican owner before ordering the vehicle's destruction. See id.
While it was not until March 23 that the vehicle was ultimately destroyed, the Order to Destroy was signed the same day as the letter significantly undermining the government's position that it was acting in good faith here. Even further undermining the government's denial of its bad faith, is the fact that the government patently failed to follow the procedure set out in its own letter that it mailed to the vehicle's owner. Following the procedure set out in the letter would necessarily have resulted in waiting more than the alleged ten days to receive a response from the owner such as a petition challenging to legality of the seizure. See e.g. Resp Ex. B., at 2 ("You may file a petition with this office within 30 days of receipt of this letter.").
The government seeks to blame Defendant for dragging his feet in seeking the vehicle because he was well aware at the detention hearing of the need for the vehicle; yet, Defendant did not request to view the vehicle until April 26. Resp. 3. This argument falls particularly flat because the government destroyed the vehicle before Defendant was even indicted, and because the burden does not fall on the defense to ask for preservation of evidence. Indeed, case law indicates the opposite. See Youngblood , 488 U.S. at 58, 109 S.Ct. 333 ; McNealy , 625 F.3d at 870 ; Ramirez , 174 F.3d at 589. Furthermore, given the very nature of the crime, the evidentiary value of the vehicle in the prosecution of this matter should have been obvious to the government from the start. The rapid destruction of the vehicle, the government's failure to justify the destruction of the vehicle pursuant to the law on which it relies, the failure of the government to follow its own procedures on which it relies, and the government's knowledge of the adversary posture of Defendant from the inception of the case all tend to show a bad faith attempt by the government to impede the defense. See McNealy , 625 F.3d at 870. Moreover, even assuming the cost of the storage of the vehicle outweighed its value, and even assuming that the decision to destroy the vehicle was somehow sound, and even assuming the government did not order the destruction of the vehicle before waiting to hear from the owner, and even assuming the government need not wait at least thirty days for the owner's response to its Notice, still the government made no attempt to even preserve the gas tank which had been extracted from the vehicle. This too was useful evidence in the case, and no doubt could have been stored at a lower cost than the vehicle. This case may well reach the high bar set by the Supreme Court in Youngblood , 488 U.S. at 58, 109 S.Ct. 333.
In the end, however, the Court need not determine whether the government acted in bad faith by attempting to impede the defense. The Court finds that the government destroyed obvious and exculpatory evidence such that its admission cannot be permitted pursuant to Trombetta , 467 U.S. at 489, 104 S.Ct. 2528, and its progeny.
B. Destruction of Obvious, Exculpatory Evidence
Pursuant to Brady v. Maryland , 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the prosecution violates due process when it suppresses or fails to disclose material exculpatory evidence to the defense. Fisher , 540 U.S. at 547, 124 S.Ct. 1200 (analyzing Brady and *940 United States v. Agurs , 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) ). A Brady violation may occur regardless of whether the State acted in good or bad faith. Fisher , 540 U.S. at 547, 124 S.Ct. 1200. To give rise to a Brady violation, however, lost or destroyed evidence must possess "an exculpatory value that was apparent before the evidence was destroyed" and be of "such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." Trombetta , 467 U.S. at 489, 104 S.Ct. 2528
As the defense explains, and the government to some extent acknowledges, this case turns on Defendant's knowledge of the presence of methamphetamine in the vehicle he was driving across the border. The ways in which the availability of the vehicle and its inspection by Defendant would likely be exculpatory are numerous. And, as explained below, this would have been apparent to the government prior to its decision to destroy the vehicle.
1. Likely exculpatory value of the evidence
An inspection of the vehicle would have allowed Defendant to determine whether there were indeed dual gas tanks in the vehicle, whether the placement of the drugs in the gas tank impeded the vehicle's functioning such that Defendant was required to push the vehicle to the border inspection station. Inspection would have also shown whether the tank could have been accessed by Defendant or someone else without dismantling the vehicle.
Further, the exculpatory value was apparent because there were clearly two gas ports, yet it appears that only one tank contained methamphetamine. Nevertheless, it is not clear whether there was a second gas tank connected to the second gas port. It was not clear which gas port the tank was related to, if there were in fact two gas tanks. Indeed, the government itself was stumped when asked by the Court which tank contained the drugs. Jul. 30 Hr'g.
The government has argued that the destruction of the vehicle is unimportant given that the government has provided Defendant with numerous photos and a video depicting the vehicle both before and after its dismantling. Resp. 5. However, as pointed out by Defendant at the Hearing, these depictions fail to address certain key evidence which defense believes to be exculpatory.
The Complaint alleges that Defendant had to push his vehicle from the top of the bridge to the inspection point. Clearly then, the vehicle was not functioning properly. Furthermore, during questioning the Defendant told the officers that he was told not to put anything in the front gas tank opening, that he should only use the back tank, and that the front tank was off limits.
Yet, based on the photographs, it appears that the methamphetamine may have been discovered in the rear tank. That Defendant stated this when the evidence would seem to indicate otherwise, is all the more reason that the inspection of the vehicle would likely have yielded exculpatory evidence. Indeed, as previously stated, the government itself was confused when asked which gas tank, the front or the back, contained the evidence. Clearly there were two gas port doors on the vehicle yet Defendant cannot know or determine which gas port, if any, led to the tank containing the drugs.
Furthermore, whether there was one or two gas tanks might explain why the vehicle became disabled at the port of entry requiring Defendant to push it to the inspection point. Based upon its questions at the hearing regarding the existence of a filler cap, the defense is not even aware of *941 whether there was a second gas tank. And the government could itself shed no light on this issue at the hearing.
The photos and videos provided by the government do nothing to resolve this question. All that is apparent from the discovery provided by the government is that there were dual gas covers on the vehicle. There was at least one gas tank, and that tank contained methamphetamine. The defense does not know, and now cannot investigate if there was a second gas tank, despite there being the second gas cover. The defense does not know whether the gas tank containing the drugs was connected to a gas filler, and, if it was, whether it was connected to the front filler or the rear filler. This is particularly important in light of Defendant's statement that he was told not to use the front filler. If the gas tank containing methamphetamine was connected to the rear filler, then his statement that he was told not to fill from the front filler would be exculpatory because that would indicate that he was not told of the drugs as he was told to fill were the drugs were located. Or inspection could have revealed that the front filler had been disconnected from a gas tank altogether which is why he was told not to fuel at that port.
If two gas tanks even existed, one can only assume that they were both destroyed by the government. This itself raises important questions such as was the second gas tank checked for its contents? Did it contain gas or was it empty? Did it also contain a controlled substance?
As part of discovery, the government disclosed to Defendant an updated memo written by CBP Officer Eric Gonzalez indicating that he had inspected Defendant as he entered the United States at the Paso Del Norte Port of Entry in the same truck on February 24, 2018, a little over a week before this arrest[2] . In this updated memo, Officer Gonzalez claims that he noticed the truck had dual gas tanks and had visible tampering on bolts on both tanks. However, no contraband was discovered at that time, and Defendant was allowed to enter the United States.
Defendant argues that none of the officers who inspected the vehicle on the date of Defendant's arrest noted any visible tampering with the gas tank bolts. The government did not provide photographs of these bolts to Defendant. An inspection of the vehicle could have allowed Defendant to cross-examine or impeach any testimony by Officer Gonzalez, or other witnesses, regarding the visible signs of tampering on the bolts around the gas tank. Inspection would have allowed Defendant to determine whether there was actually any evidence of tampering, whether any tampering was "visible" as Officer Gonzalez originally stated, or whether such visible tampering was only visible to the "CBP trained eye" as the government only now contends in its Response. Resp. 5.
That the gas tank bolt tampering marks were only visible to the trained eye supports the defense position that he was unaware of the drugs in the vehicle. Indeed, it would likely be exculpatory for the defense, tending to show that the marks were not visible to him as a transporter of clothing, untrained in the ways of drug smuggling. Had the truck with its tampered bolts been available for the defense, such evidence would only serve to support a finding that defendant did not know that the tank had been tampered with, and that *942 there was drugs in the vehicle. In the least, it would have added to the government's burden to show that Defendant was trained such that the tampering of the bolts was visible to him. Thus, even were the government's averments true, the evidence is exculpatory.
There are various scenarios giving rise to the use of this evidence as exculpatory. First, Defendant's examination could have confirmed the marks of tampering, in which case he could have cross-examined the Officer Gonzalez's statement that the bolts had visible tampering marks and yet, there was the lack of notice of the tampering at the March 3, 2018, stop. If Officer Gonzalez testified at trial that the marks were only visible to the trained eye, Defendant could have cross examined him as to whether Defendant could have been aware of the markings. This would tend to negate Defendant's knowledge. Finally, an inspection of the vehicle might have shown no marks of tampering whatsoever. This evidence could be obviously used for purposes of cross-examination.
Moreover, that the vehicle had exculpatory value was obvious to the government because there was notation of a hidden compartment behind the back seat of the vehicle in the May 31, 2018, Person Subject Record, yet no hidden compartment was noted by the officers in the March 3, 2018, stop. The government asserts this hidden compartment is much ado about nothing--that the notation was in error. Yet, the government conveniently reveals this mistake only after Defendant's request to suppress the evidence, just as with the bolts markings being visible, but only to the CBP officer's "trained eyes." It was obvious to the government that inspection of the vehicle could have exculpatory value to Defendant because of Defendant's own statements to the officers at the time of the stop about the vehicle, the vehicle's condition at the time of the stop, and because of the inconsistencies between the Person Subject Record describing the vehicle and the state of the vehicle when they had stopped it on March 3, 2018.
2. Comparable evidence by other reasonably available means
The government argues that the photos and the video recordings are sufficient to remedy any prejudice to Defendant caused by the government's almost immediate decision to destroy the vehicle. To the Court's eye, the photos and video do not solve the problem, they only raise more questions, as Defendant points out. For example, while the photographs show the two very prominent gas covers, one photo shows both covers closed while the other shows only one cover open. This fact raises the questions such as: why only one gas cover open; was the front cover sealed shut such that only the rear cover could be opened; does the open rear cover signify that the tank with the drugs was found connected to the rear filler, and, if so, does that somehow undermine or support Defendant's statement to the officers that he was told to fill only the rear filler? Further, it is not evident from the photos whether the dual gas covers were factory original or installed after purchase. Defendant's inspection could have revealed whether the vehicle had been modified from its original factory condition to add a second gas tank or had otherwise been somehow modified. Defendant could have used this information to undermine assertions of his knowledge of the presence of the drugs. It is unclear from the photos whether there were even two gas tanks despite the dual gas covers.
The photographs which the government has provided as well as the video recording of the vehicle break down do not alleviate or remedy the problem. There are no photos, at least discernable ones, showing the *943 tank or tanks underneath the truck. There is a very dark photo of the underside of the vehicle but it is essentially useless. And the video is of little use because, like the photos, it does not show where the tank came from, which filler it was connected to, whether there even was a second gas tank. The video is grainy and recorded from a distance. The photos and video certainly support the finding that the tank and the methamphetamine came from this vehicle. But that does not address Defendant's concern with the government's destruction of the evidence. Rather, Defendant's concern is that the inspection of the vehicle could have provided him with exculpatory and impeachment information related to Defendant's knowledge. As an example, Defendant could have discovered whether he could possibly have known that the bolts had been tampered with, indeed, whether they were actually tampered with at all. There are no photos or videos of that evidence.
For all of the above reasons, the Court finds that the government should be sanctioned for the destruction of the vehicle which obviously possessed exculpatory evidentiary value. See United States v. Garrett , 238 F.3d 293, 298 (5th Cir. 2000) ; Ramirez , 174 F.3d at 589. The government shall not be permitted to introduce the photographic and video evidence of the vehicle at trial. Moreover, the government may not introduce evidence of the vehicle's alleged dual gas tanks, the vehicle's alleged hidden compartment under the rear seat, evidence of the visibly tampered with bolts, nor any evidence of the condition of the vehicle.
III. CONCLUSION
Defendant's Motion, ECF No. 51, is GRANTED in part. The government may not use the photographic or video evidence of the vehicle. Further, the government may not introduce any evidence of the vehicle having dual gas tanks, if indeed it did have dual gas tanks, dual gas covers, or dual gas fillers, and the government may not introduce any evidence of the vehicle containing a hidden compartment under the rear seat, any evidence related to the gas tank bolts, or any other evidence of the condition of the vehicle.
As for Defendant's request for a jury instruction of spoliation, the issue is TAKEN UNDER ADVISEMENT . The Court reserves ruling on this until the time of jury instruction.
SO ORDERED.

The Court refers to facts alleged in the Complaint for context only and, by no means, makes any finding as to their accuracy or veracity.

The Court granted the government's request to introduce evidence of this incident at trial under Federal Rule of Evidence 404(b).